**SOUTHERN PAC. CO. v. UNITED STATES.**

No. 46236.

Court of Claims.

Jan. 6, 1947.

LITTLETON, Judge, dissenting.

———◆———

Lawrence Cake, of Washington, D. C. (C. O. Amonette, of San Francisco, Cal., on the brief), for plaintiff.

S. R. Gamer, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen. (Louis R. Mehlinger and Henry Weihofen, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHALEY, Chief Justice.

The plaintiff is a common carrier by railroad and sues to recover what it asserts to be underpayments for transportation of freight to relocation centers established in the United States for persons of Japanese ancestry evacuated during wartime from areas along the Pacific Coast.

The underpayments, so claimed, are disallowances made by the defendant from plaintiff's bills for transportation because of land-grants. The plaintiff was a land-aided carrier or equalizing therewith, and by reason thereof had been carrying property of the United States at less than commercial tariff rates. The transportation act of 1940 was approved September 18, 1940. Sect'on 321(a) thereof, 54 Stat. 898, 954, 49 U.S.C.A. § 65(a), reads, with emphasis supplied:

"Sec. 321. (a) Notwithstanding any other provision of law, but subject to the provisions of sections 1(7) and 22 of the Interstate Commerce Act, as amended, the full applicable commercial rates, fares, or charges shall be paid for transportation by any common carrier subject to such Act of any persons or property for the United States, or on its behalf, except that *the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use* or to the transportation of members of the military or naval forces of the United States (or of property of such members) when such members are traveling on official duty; and the rate determined by the Interstate Commerce Commission as reasonable therefor shall be paid for the transportation by railroad of the United States mail: *Provid-*

*ed, however,* That any carrier by railroad and the United States may enter into contracts for the transportation of the United States mail for less than such rate: *Provided, further,* That section 3709, Revised Statutes (U.S.C., 1934 edition, title 41, sec. 5), shall not hereafter be construed as requiring advertising for bids in connection with the procurement of transportation services when the services required can be procured from any common carrier lawfully operating in the territory where such services are to be performed."

There is to be determined in this case the question whether the property transported was for military use.

It was destined to War Relocation Centers and was for the use there of persons of Japanese ancestry or for the War Relocation Authority in the administration of those centers. The property transported was not of a combat nature, such as guns, ammunition, tanks, but was such as civilians might use in ordinary community life.

The forced migration of these people from Pacific Coast Areas is familiar enough to the ordinary follower of public events.

It originated in what the military authorities considered a military necessity. The President, as President of the United States. and Commander in Chief of the Army and. Navy, issued the following order February 19, 1942:

Executive Order 9066
"Authorizing the Secretary of War to Prescribe Military Areas

"Whereas the successful prosecution of the war requires every possible protection against espionage and against sabotage to. national-defense material, national-defense premises, and national-defense utilities as. defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act. of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655, (U.S.C., Title 50, Sec. 104):

"Now, Therefore, by virtue of the authority vested in me as President of the United States, and Commander in Chief of the Army and Navy, I hereby authorize and direct the Secretary of War, and the Military Commanders whom he may from,

time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion. The Secretary of War is hereby authorized to provide for residents of any such area who are excluded therefrom, such transportation, food, shelter, and other accommodations as may be necessary, in the judgment of the Secretary of War or the said Military Commander, and until other arrangements are made, to accomplish the purpose of this order. The designation of military areas in any region or locality shall supersede designations of prohibited and restricted areas by the Attorney General under the Proclamations of December 7 and 8, 1941, and shall supersede the responsibility and authority of the Attorney General under the said Proclamations in respect of such prohibited and restricted areas.

"I hereby further authorize and direct the Secretary of War and the said Military Commanders to take such other steps as he or the appropriate Military Commander may deem advisable to enforce compliance with the restrictions applicable to each Military area hereinabove authorized to be designated, including the use of Federal troops and other Federal Agencies, with authority to accept assistance of state and local agencies.

"I hereby further authorize and direct all Executive Departments, independent establishments and other Federal Agencies, to assist the Secretary of War or the said Military Commanders in carrying out this Executive Order, including the furnishing of medical aid, hospitalization, food, clothing, transportation, use of land, shelter, and other supplies, equipment, utilities, facilities, and services.

"This order shall not be construed as modifying or limiting in any way the authority heretofore granted under Executive Order No. 8972, dated December 12, 1941, nor shall it be construed as limiting or modifying the duty and responsibility of the Federal Bureau of Investigation, with respect to the investigation of alleged acts of sabotage or the duty and responsibility of the Attorney General and the Department of Justice under the Proclamations of December 7 and 8, 1941, prescribing regulations for the conduct and control of alien enemies, except as such duty and responsibility is superseded by the designation of military areas hereunder.

> "Franklin D. Roosevelt

"The White House,

"February 19, 1942."

From this executive order followed the relocation of persons of Japanese ancestry. The next day, February 20, 1942, the Secretary of War designated Lt. Gen. J. L. De Witt as the military commander to carry out the duties and responsibilities imposed by Executive Order No. 9066 for the Western Defense Command. The Western Defense Command comprised the States of Washington, Oregon, California, Montana, Idaho, Nevada, Utah, Arizona, and the Territory of Alaska.

General De Witt, thus authorized and empowered, proceeded to set apart certain military areas from portions of which these people were to be excluded, and their exclusion he determined to be a military necessity.

This exclusion, however, was not the whole process involved. Places had to be found to which they might be moved. They were first taken to assembly centers and thence removed to the War Relocation Centers. They were moved by the War Department under military escort. Each relocation center was under military police control and protection.

General De Witt, realizing that the program involved the handling of thousands of civilians, organized as a part of his command an agency which he termed the Wartime Civil Control Administration to carry out missions involving civilian control. The President himself on March 18, 1942, established the War Relocation Authority in his Office for Emergency Management of the Executive Office of the President. The functions of this Authority are de-

scribed in Finding No. 7. The War Relocation Authority operated and maintained the relocation centers, but in doing so it was clearly taking over a burden that otherwise belonged to the military. The War Relocation Authority by no means excluded the military—in fact the War Department and the War Relocation Authority entered into an agreement April 17, 1942, as to division of duties, and under this agreement the War Department kept effective control over the separation of these people of Japanese ancestry from prohibited military areas. This was done largely by delegation of authority, but General De Witt retained direct authority as to release of evacuees for the purpose of returning ·to the excluded areas.

The primary purpose of excluding the evacuees from designated military areas did not end merely by escorting them from those areas and preventing their return. To do that and no more could not be characterized as civilized warfare. The policy of our country has been to conduct warfare on as high a scale as possible. To oust these people from their homes and cast them adrift when they could well be cared for, or be put in a position where they could care for themselves, would not have been civilized.

We think the military effort extended to the relocation centers; that the military arm was not relaxed after the evacuees were relocated, and that the use of civilian agencies to care for these people did not make military necessity something other than what it was from beginning to end.

The shipments which are the subject-matter of suit were military property of the United States moving for military and not for civil use within the meaning of Section 321(a) of the Transportation Act of 1940, and the plaintiff is therefore not entitled to recover.

The petition is dismissed. It is so ordered.

MADDEN, JONES, and WHITAKER, Judges, concur.

LITTLETON, Judge, dissents.